IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 14, 2017

**STATE OF TENNESSEE v. TIMOTHY A. CROWELL**

**Appeal from the Criminal Court for Davidson County**
**No. 2014-A-332     Cheryl A. Blackburn, Judge**

————————————————————

**No. M2016-01980-CCA-R3-CD**

————————————————————

A Davidson County Criminal Court Jury found the Appellant guilty of aggravated robbery. The trial court sentenced the Appellant as a Range II, multiple offender to eighteen years in the Tennessee Department of Correction. On appeal, the Appellant contends that (1) the trial court erred by allowing the State to introduce proof from a portion of a surveillance video that was not preserved for trial; (2) the trial court erred by allowing a State's witness to testify regarding hearsay evidence; (3) the trial court erred by allowing a photograph lineup that had not been introduced as evidence to be taken into the jury deliberations room; (4) the evidence is not sufficient to sustain his conviction of aggravated robbery; and (5) the length of his sentence is excessive. On appeal, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Emma Rae Tennent (on appeal), Kristen Neff and Chase Cunningham (at trial), Nashville, Tennessee, for the Appellant, Timothy A. Crowell.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; Glenn R. Funk, District Attorney General; and Leandra Varney and Megan King, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

In January 2014, a Davidson County Grand Jury returned an indictment charging the Appellant with the October 19, 2013 aggravated robbery of Public Storage.[1] At trial, Tiffany Michelle Jewkes O'Donnell testified that in September 2013, she was twenty-four years old and had moved from Dallas, Texas, to Nashville. In October 2013, she was working as a "relief manager" for Public Storage in Nashville. The company had multiple locations in the city, and O'Donnell[2] was not assigned to a specific location. On October 19, 2013, she was working from 9:30 a.m. to 5:00 p.m. at the store located at 408 Welshwood Drive. It was her first time at that location. O'Donnell said that generally, only one person worked at a store at a time.

O'Donnell said that around noon, she saw a customer park a white Chevrolet Impala in front of the office door. The customer, whom O'Donnell identified as the Appellant, entered the store and stood at the counter separating the office area from the customer area. O'Donnell stood up and faced the Appellant, who was standing on the opposite side of the counter. O'Donnell said that the office had good lighting and that she and the Appellant were standing approximately two feet apart. The Appellant asked O'Donnell about storage units, and for the next three to five minutes, they discussed the prices of the units. O'Donnell had a clear view of the Appellant during their conversation, and she found nothing alarming about their interaction. The Appellant told O'Donnell he had to go outside to get his wallet. She turned to her computer to get the paperwork ready and did not watch him leave.

When the Appellant re-entered the store, O'Donnell was behind the counter looking at a computer screen. The Appellant walked behind the counter, stood beside her, and pointed a black gun at the right side of her head. The gun was "[k]ind of" touching her head. O'Donnell did not want to anger the Appellant by staring at him, but she listened to his voice, glanced at him, saw his clothing, and was able to confirm he was the same man who had just asked about a storage unit. The Appellant demanded all the cash but told her he did not want any checks. O'Donnell gave the Appellant the cash from the petty cash drawer, but the Appellant then told her to give him the money from the safe, and she complied. O'Donnell said the safe was underneath the desk, which was behind the counter and could not be seen from the front of the counter. O'Donnell estimated that the Appellant took a total of $560. After obtaining the money, the Appellant walked out of the store, and O'Donnell immediately ran to the door and locked it. She watched the Appellant get into a white Impala and leave. O'Donnell said that

---

[1] In count one of the same indictment, the Appellant was charged with the aggravated robbery of the same Public Storage on October 11, 2013. Prior to trial, the trial court granted the Appellant's motion to try the counts separately. The instant case concerns count two.

[2] Presiding Judge John Everett Williams has taken the position that referring to witnesses by their last names, without common titles such as Mr. or Mrs., is disrespectful. However, in referring to witnesses without their titles, we mean no disrespect to the witnesses.

after the Appellant returned to the store, the incident lasted approximately two or three minutes. The Appellant did not wear anything to block or conceal his face.

O'Donnell said that around 12:10 p.m., she called 911 and reported the robbery. She told the 911 operator that the Appellant "was wearing a brown [workout] suit with stripes and he was 5'9", average weight." She also said the Appellant was an African American male, and he was driving a white car. The police arrived at the store approximately fifteen minutes later. At that time, she told the officers that the Appellant weighed around 220 pounds, that he was in his forties, and that he was driving a white Impala. The officers asked if she could identify the robber, and she responded affirmatively.

O'Donnell said that the store had no security cameras. The police attempted to collect fingerprints from the store. O'Donnell recalled that the Appellant "just kind of lean[ed] up on" the counter, and crossed his arms on the counter but did not touch the counter with his fingers. She did not see whether he touched the door when he entered and exited the store. To enter the store, a customer had to pull on the door and had to push the door to exit.

O'Donnell said that four days after the robbery, she identified the Appellant from a photograph array. At the time of the identification, she stated she was "a hundred percent positive" of the identification. She stated that she had identified the Appellant as the perpetrator during a prior hearing and that she was sure of her identification at that time and at the time of trial.

O'Donnell said that she was working as a property manager with Public Storage at a different location and that she had access to the store's rental records. She found a record reflecting that the Appellant had rented a storage unit at the Welshwood Drive location on September 12, 2013, and that he had vacated the storage unit on October 4, 2013. O'Donnell said that she did not rent the unit to the Appellant and that she had never seen him before the robbery.

On cross-examination, O'Donnell acknowledged she was so upset during the 911 call that she initially gave the 911 operator her home address instead of the store's address. She told the operator that the robber was "a black man driving a white car" and that he was wearing a "brown sweat suit," which was possibly "Phat Farm" brand. She told the operator that he was 5'8" or 5'7" tall and average weight. She did not mention that the Appellant had facial hair. O'Donnell told the operator that the car had four doors but that she did not know the make or model of the car. She did not write down the license plate number of the Appellant's vehicle as he drove away.

O'Donnell said that when the police arrived, she first spoke with Officer Cammarn and told him the robber's vehicle was a four-door white car and that the robber weighed 200 pounds and was wearing a brown sweat suit. When Detective Dozier arrived at the scene two or three minutes later, she told him the robber was "probably a little under [Detective Dozier's] height" and that the robber's weight was "220, average weight." She also told Detective Dozier that the robber had "a short fade haircut" and that she did not see any gray hair. She denied saying the robber was clean shaven. O'Donnell told Detective Dozier that the Appellant was wearing "a light brown/tan velour track suit . . . [with] an orange stripe on at least one of the sleeves." She also told the detective that the Appellant had the gun in his left hand and that "the car was dirty but not beat up." She said she did not recall seeing any damage to the car, acknowledging that she "didn't pay attention to detail."

O'Donnell said that she only had to push a button in order to open the cash register. She attempted to hand the Appellant the customers' personal checks, but the Appellant did not want the checks. The Appellant demanded money from the safe and pointed toward the safe, indicating he knew where it was. She opened the safe with a key, handed the Appellant the money from the safe, and he left the store. She said that when he drove out of the store's parking lot, he turned left toward Nolensville Road.

O'Donnell acknowledged that she told Detective Dozier about the items the Appellant touched in the store, such as the door when he entered, but she maintained that the Appellant "didn't really touch anything." She conceded that she told Detective Dozier that the Appellant was not wearing gloves and that he touched the counter. O'Donnell was present when the officers dusted for fingerprints and told them to try to get fingerprints from the door and from the counter, even though she did not know if the Appellant's palms or fingers ever touched the counter.

O'Donnell acknowledged that Detective Stewart was assigned to the case and that he came to her residence mid-afternoon on October 24, 2013, to show her the photograph lineup. She estimated that she looked at the lineup for five minutes.

On redirect examination, O'Donnell said that she was scared when the Appellant pointed the gun at her. Although she tried not to look at the Appellant while he was pointing the gun at her, she was able to "get a good look at him during [their] initial interaction when he did not have a gun."

O'Donnell said that Detective Dozier asked her to estimate the Appellant's height in relation to the detective's height; O'Donnell did not say the Appellant was 6'1" tall but estimated he was close to Detective Dozier's height. O'Donnell said she told the 911 operator that the Appellant was approximately 5'9" tall. O'Donnell denied telling Detective Dozier or the 911 operator that the Appellant was 6'1" tall or that he was clean

- 4 -

shaven. She acknowledged that she did not recall whether the Appellant had facial hair. She said she told Detective Dozier that she "didn't see gray hair, but [the Appellant's] hair was not jet black."

O'Donnell said that she realized the Appellant's car was an Impala after speaking with her co-worker, Kymberly Walker. O'Donnell clarified that the Appellant never touched the counter with his palms or fingers.

O'Donnell said she was able to identify the Appellant's photograph "[b]y just having that interaction with him whenever he first came in to talk to me. Just three to five minutes, I mean, that gave me enough time to remember what his face looked like."

Cheteka Crowell, the Appellant's wife, testified that the Appellant was arrested on October 24, 2013. One of his co-workers notified her of the arrest, and she went to the Appellant's place of employment where the arrest was taking place. The officers on the scene explained that the Appellant was being arrested because he was identified from a photograph lineup as the person who had robbed a store that rented storage units. Crowell said that in response, she "just shook [her] head, [she] didn't say anything."

The police told Crowell that her car, a white, four-door, 2006 Chevrolet Impala, had been used during the robbery. Crowell said that she worked at the Walgreens store on Edmondson Pike, that the store had outside surveillance cameras which recorded the parking lot, and that she asked for surveillance footage from October 19, 2013, to be "pulled." Crowell watched the video and saw the Appellant's vehicle, a gray 2004 Honda Element, drive into the parking lot. She explained, "[Y]ou didn't actually see him, but you see my car backing out and leaving the premises." The Appellant took the Impala around 11:50 a.m., returned it between 12:15 and 12:17 p.m., and parked it in the same place it had been parked earlier. Crowell said that the Appellant had left no indication that he had been in her car while she was at work, noting that he usually adjusted the driver's seat to his height when he drove it but that he had not done so that day. Crowell recalled that the Appellant was at home when she left for work at 11:00 a.m. on October 19. Before she left, the Appellant did not mention that he wanted to use her car, and after she came home, he never told her that he had used her car.

A copy of the surveillance video was played for the jury. Crowell agreed that the video "obviously cuts off" and that "once . . . you could see more to this video." She said the missing portion of the video showed the Appellant "returning the car and showed him getting back into his Element and then him exiting the parking lot on the same side that he left – that he left with the Impala." Crowell did not know what happened to the missing portion of the surveillance video.

- 5 -

Crowell said that on October 19, she and the Appellant were co-owners of the Impala and the Element, that she and the Appellant each had a set of keys to the Impala, and that they were the only people who had keys to the Impala. Crowell did not have a set of keys to the Element. She acknowledged that one of her sons occasionally drove the Impala when she or the Appellant gave him permission.

Crowell said that she told the police what she saw on the Walgreens surveillance video. She recalled that she and the Appellant had rented a storage unit briefly from Public Storage on Welshwood Drive. Around the time of the robbery, the Appellant owned a black gun that was not real but "[i]t looked real. It had a laser light on it." She said that she was not having money troubles; however, on the day of the Appellant's arrest, the Appellant's co-workers showed her "some documents" reflecting that the Appellant "had gotten advances on a couple of his checks." She also saw that the company had written a check to pay the Appellant's car note.

Crowell said that when she got home on the day of the robbery, the Appellant suggested they go out to eat. She responded that they did not have enough money and asked how they could afford to eat out. Nevertheless, the Appellant insisted, and the family went to a Ruby Tuesday's restaurant. The Appellant paid for the approximately $80 meal with cash. He did not explain where he had obtained the cash. Crowell noted that the Appellant's last paycheck was issued the week before the meal.

On cross-examination, Crowell said that the Appellant's manager had shown her the documents reflecting the payments to the Appellant. She recalled that she reviewed the Walgreens surveillance video the day before the Appellant's arrest, then she contacted Detective Stewart and told him about the video. Detective Stewart came to Walgreens and watched the video with her. She stated that her car appeared clean in the video, that she typically kept her car clean, and that it was clean at the time of the robbery.

Crowell acknowledged that the video did not show what the person who took her car was wearing. Crowell said that she was 5'5" tall and that when the Appellant drove her car, he usually had to adjust the driver's seat to accommodate his height. She recalled that in 2013, the Appellant had a short, partially gray, "kind of a goatee beard." The Appellant's hair usually was "pretty short," but at the time of his arrest, "his hair was a little bit bushy" and needed to be trimmed. Crowell said that she bought all of the Appellant's clothes and that, to her knowledge, the Appellant did not have a brown velour track suit or "any kind of track suit with Baby Phat with orange trim." She said the Appellant usually wore jeans and t-shirts. She recalled that the Appellant was right-handed.

- 6 -

On redirect examination, Crowell said that she confronted the Appellant about whether he had moved her car on the day of the robbery. He told her that he got the car to put gas in it. She doubted his claim because he was with her the day before the robbery when she put gas in both the Element and the Impala.

Crowell said that in 2013, her oldest son, Dominique, was eighteen years old. Her younger son was fourteen years old and did not know how to drive. The Appellant was not the father of either child, and they did not look like the Appellant. She noted that Dominique had a darker complexion than the Appellant, that he was bigger "body-wise," that he was "fat," and that "something [was] wrong with his right leg, so he kind of drag[ged] his right leg when he walk[ed]." She thought both the Appellant and Dominique were approximately 5'10" tall. Her younger son was six feet tall and had a smaller build than the Appellant.

Michael Brian Pressley testified that in October 2013, he was the store manager of the Walgreens store on Edmondson Pike and that Crowell was one of the store's employees. Sometime late that month, she asked Pressley to find the October 19, 2013 surveillance video of the store's parking lot. Pressley watched the video alone and saw the Appellant's vehicle park next to Crowell's white car. The Appellant exited his vehicle, got into Crowell's car, and drove out of the parking lot. Approximately twenty minutes later, the Appellant returned in Crowell's car. He parked her car in the same space it was in earlier, got back into his vehicle, and drove away.

A detective asked Pressley to make a copy of the surveillance video, and Pressley complied. He later learned that the copy he made for the detective did not include the portion of the video showing the Appellant returning Crowell's car, but he did not know what caused the recording malfunction.

On cross-examination, Pressley clarified that Crowell asked him to find the surveillance video because "her car was accused of being in a robbery." He said Walgreens no longer had that particular surveillance video because the store had replaced the old surveillance system with two new digital video recorders (DVRs). He thought the surveillance system preserved video "anywhere from ninety to 180 days." He agreed that the video did not show who got into Crowell's car.

William Stewart testified that in October 2013, he was a detective with the South Precinct of the Metropolitan Nashville Police Department (Metro). Although another detective responded to the scene, Detective Stewart was the lead investigator. Detective Stewart prepared a photograph lineup, which included the Appellant, and, on October 24, five days after the robbery, Detective Stewart showed O'Donnell the photograph lineup. Within seconds, she identified the Appellant as the robber and was one hundred percent certain of her identification.

Detective Stewart arrested the Appellant later that afternoon at the Appellant's place of employment. Detective Stewart said that when he saw the Appellant in person, the Appellant matched O'Donnell's description of the robber. Shortly after the Appellant's arrest, Crowell came to the Appellant's place of employment. Detective Stewart explained to her the reason for the Appellant's arrest.

Two or three days later, Detective Stewart received a call from Crowell, informing him of the Walgreens surveillance video. Detective Stewart called Walgreens and asked the store manager to make a copy of the video. Thereafter, Detective Stewart went to the store to pick up the disk. When he watched it the following day, he realized a portion of the video was missing but never obtained a complete copy of the video. Detective Stewart said that he had requested the video in order to verify the information Crowell gave him and that the portion of the video he had proved that her information was accurate. Detective Stewart estimated that Walgreens was three miles from Public Storage and was a seven-minute drive.

On cross-examination, Detective Stewart acknowledged that the Appellant's lineup photograph was taken on May 13, 2013, approximately five months before the robbery. Detective Stewart agreed that in the photograph, the Appellant "ha[d] a short fade haircut," a mustache, and goatee in which some gray hair was showing. Detective Stewart agreed that a photograph taken of the Appellant on the day of his arrest showed that he had a goatee and that it had been a week or two since his hair had been cut.

Detective Stewart said that he did not watch the Walgreens surveillance video with Crowell and did not watch the video while at Walgreens. He picked up the surveillance video from Walgreens on October 29, 2013, and probably watched the video the next day. Although he noticed part of the original surveillance video was missing, he did not request a new copy of the video. Detective Stewart acknowledged that Public Storage did not have any security cameras and that, to his knowledge, the police did not contact businesses near Public Storage to determine if they had security cameras that might have recorded the robbery suspect or the getaway car. Detective Stewart conceded that he did not ask Crowell who drove her car or had keys to her car; however, he knew that her son, Dominique Taylor, sometimes drove the Appellant's Honda Element. He did not know that Taylor sometimes drove Crowell's Impala.

Rhonda Evans testified that in October 2013, she was assigned to Metro's Identification Unit, which was responsible for gathering evidence at crime scenes. On October 19, 2013, she was dispatched to Public Storage on Welshwood Drive. The officers on the scene informed her that the robber had entered the store through the door, possibly touched the counter, and exited through the same door. Accordingly, she

checked the doorway and counter for fingerprints. She obtained fingerprints from the exterior door handle.

On cross-examination, Evans stated that she also obtained fingerprints from the countertop and the door, but she could not recall how many fingerprints she found. She gave the fingerprints she discovered to the Latent Print Unit of the crime laboratory for processing.

Monica Kent testified that she was a forensic scientist latent print examiner with the Metro's Latent Print Unit. She compared the fingerprints found at the scene with the Appellant's known fingerprints. Some of the fingerprints from the scene did not contain enough ridge detail for comparison; therefore, Kent was unable to determine who had left the fingerprints. The fingerprints that contained sufficient detail for comparison did not match the Appellant's fingerprints. Kent stated that the Appellant could have touched areas in the store and not left fingerprints. On cross-examination, Kent stated that she was given "seven latent lift cards" and that "five of them had identifiable impressions."

Jeffrey Neuschatz, Ph.D., a cognopsychologist, testified for the defense as an expert in the field of eyewitness identification. He acknowledged that he was being compensated for his testimony by the defense but asserted that the compensation did not affect his testimony.

Dr. Neuschatz said that after witnessing an event, a person retained incomplete, fragmented, and disorganized information and that the memories could change over time. When asked to explain what factors made memory more or less accurate, Dr. Neuschatz stated that memory usually was more accurate when a person had ample time to study the information without stress or distraction. Conversely, memory was less accurate when a person was given less time study the information and the situation surrounding the information was stressful. Dr. Neuschatz also stated that a person's memory shortly after an event was likely to be more accurate than one after a lapse in time. Dr. Neuschatz "assume[d] weapons would make things more stressful" because people generally focused on the weapon, not other aspects of what was happening. Dr. Neuschatz acknowledged, however, that a person's memory of a situation involving a weapon, high stress, and a short study time would not always be inaccurate. Dr. Neuschatz stated that "[c]ross-race identification is the idea that you have to identify somebody from a different race. And what happens is that it's more difficult to identify people who are not the same race as you."[3]

----

[3]Although Dr. Neuschatz testified regarding the problems with cross-race identification, the record does not reflect whether the instant case concerned a cross-race identification scenario.

On cross-examination, Dr. Neuschatz acknowledged that he had testified for defendants approximately eighty-five times but had never testified on behalf of the prosecution. He conceded that the following factors could contribute to a more accurate identification: good lighting, "unobscured or uninterrupted vision," close distance, length of exposure, degree of attention of the witness, and certainty of identification.

Metro Detective Brandon Dozier testified that he reported to the scene of the robbery, spoke with O'Donnell, and prepared a report based upon their conversation. He had little independent recollection of the conversation; however, his report reflected that O'Donnell told him that the robber was a black man, that he was not wearing gloves, and that he touched the counter. O'Donnell opined that the robber's height, weight, and facial hair were similar to Detective Dozier's height, weight, and facial hair. Detective Dozier testified that he was 6'1" tall, weighed 250 pounds, and was clean shaven. O'Donnell said the robber's hair was dark but not jet black.

On cross-examination, Detective Dozier said that the State had never instructed him to lie during trial. O'Donnell told him that the Appellant touched the counter, but she did not tell him how the Appellant touched the counter. Detective Dozier acknowledged that O'Donnell never specifically said that the Appellant was clean shaven or that he was a certain height or weight.

At the conclusion of the proof, the jury found the Appellant guilty of aggravated robbery. The trial court sentenced the Appellant as a Range II, multiple offender to eighteen years in the Tennessee Department of Correction. On appeal, the Appellant contends that (1) the trial court erred by allowing Crowell and Pressley to testify regarding a portion of a surveillance video that was not preserved for trial in violation of State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999); (2) the trial court erred by allowing Crowell to testify regarding hearsay evidence; (3) the trial court erred by allowing a photograph lineup to be taken into the jury deliberations room; (4) the evidence is not sufficient to sustain his conviction of aggravated robbery; and (5) his sentence is excessive.

## II. Analysis

### A. Surveillance Video

Prior to trial, the Appellant filed a motion in limine to prohibit the State from introducing Crowell's testimony regarding the surveillance video. In the motion, the Appellant argued that Crowell told Detective Stewart that the video showed that her Impala was driven from the Walgreens parking lot at 11:50 p.m. and was returned at 12:17 p.m. The Appellant contended, however, that the partial video obtained by Detective Stewart showed that Crowell's Impala was taken at 11:57 a.m. but did not

show the car's return. The Appellant contended that he was deprived of the opportunity to see the part of the video that showed the time the Impala left the parking lot and the time the car was returned. He claimed that the video was "essential" and "could have been exculpatory," and that the State had a duty to preserve the evidence.

At a hearing on the motion, Pressley testified that in 2013, he was the store manager at the Walgreens store on Edmondson Pike and that he knew Crowell. Pressley recalled that in October 2013, an incident occurred wherein the Appellant used her car in a crime. The police asked Pressley to find the surveillance video for the store's parking lot for the day of the crime. Pressley found and watched the video. He said the video showed that Crowell's car was parked in the parking lot. Another vehicle pulled up, someone got out of that vehicle, got into Crowell's car, and left in her car. Approximately twenty minutes later, the person returned in Crowell's car, left her car in the parking lot, and left in the vehicle in which the person originally arrived.

Pressley said that he copied the surveillance video onto a disk for the police. He put the disk into a safe for an officer to pick up at a later time. Pressley thought the surveillance system would have retained the video for thirty or ninety days.

On cross-examination, Pressley said that he did not recall if an officer was present when he copied the surveillance video onto the disk. Pressley did not know why the disk did not include the footage showing Crowell's car returning to the parking lot.

Upon questioning by the trial court, Pressley said that he recognized the Appellant as the person who took Crowell's car. He estimated that the Appellant had Crowell's car for twenty or twenty-five minutes.

On redirect examination, Pressley said that he recognized the other vehicle as the Appellant's vehicle. He stated that "based on [his] recollection[,] . . . it was pretty clear that it was [the Appellant]." However, he acknowledged that he could not "see [the Appellant's] face a hundred percent."

Pressley said that he was unable to watch the disk after he recorded it for the police, explaining that the surveillance system had no playback capability. He stated that the store had two dedicated cameras outside and that in order to copy the video to a disk, he had to select the camera from which the "clip" was recorded. He "guess[ed]" that the file may have been too large for the disk.

At the conclusion of the hearing, the trial court denied the motion, finding that the State "preserved the video evidence in the same condition as it was provided by Walgreens" and that "the State [was] not responsible for the third-party surveillance system or any errors in recording that may have occurred by Walgreens staff." The trial

court further found that the Appellant's concerns regarding the accuracy of Crowell's testimony concerning the timing of the departure and return of the Impala went toward the weight of her testimony, not its admissibility.

On appeal, the Appellant contends that the State violated its duty to preserve evidence because "the missing portion of the video surveillance had potentially exculpatory value because it may have challenged the State's alleged timeframe of the robbery and identity of [the Appellant] as the suspect." The Appellant further contends that the State's degree of negligence was "significant," noting "that the State took no action to obtain a complete copy of the recording, despite its knowledge of the missing contents and its use of the incomplete video as evidence at trial." The Appellant maintains that, instead, "Detective Stewart appears to have made an affirmative, unilateral decision to forego any attempt to acquire a complete recording upon concluding that the portion he did possess met the State's needs." The State responds that the State did not lose or destroy any evidence and that the Appellant's true complaint is that the State failed to collect certain evidence. The State maintains that it did not have a duty to collect a complete copy of the surveillance video; therefore, the Appellant is not entitled to relief. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). As such, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963).

In State v. Ferguson, 2 S.W.3d 912, 915-18 (Tenn. 1999), our supreme court addressed the issue of when a defendant is entitled to relief in the event the State has lost or destroyed evidence that was alleged to have been exculpatory. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Id. at 917. Ordinarily, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. However,

> [w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Id. (quoting <u>California v. Trombetta</u>, 467 U.S. 479, 488-89 (1984)).

If the proof demonstrates the existence of a duty to preserve the evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options such as dismissing the charges or providing an appropriate jury instruction. <u>Id.</u> This court reviews the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. <u>State v. Merriman</u>, 410 S.W.3d 779, 791 (Tenn. 2013).

As the State points out, the video in its entirety "was privately owned and never in the State's possession or control." <u>State v. Ladarron S. Gaines</u>, No. M2013-02272-CCA-R3-CD, 2014 WL 4179123, at *8 (Tenn. Crim. App. at Nashville, Aug. 22, 2014) (citing <u>State v. Yevette Somerville</u>, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730, at *4 (Tenn. Crim. App. at Jackson, Feb. 11, 2002)); <u>see also</u> <u>State v. Mario Hubbard</u>, No. W2016-01521-CCA-R3-CD, 2017 WL 2472372, at *7 (Tenn. Crim. App. at Jackson, June 7, 2017); <u>State v. Cordell Bufford</u>, No. W2013-00841-CCA-R3-CD, 2014 WL 2129526, at *13 (Tenn. Crim. App. at Jackson, May 20, 2014). <u>But see</u> <u>State v. Rickey Bradford</u>, No. M2012-02616-CCA-R3-CD, 2014 WL 2494548, at *13 (Tenn. Crim. App. at Nashville, May 30, 2014). The State did not lose or destroy the video; in fact, it preserved the portion of the video it obtained and introduced the portion of the video at trial.

The Appellant's main complaint is that the State made no attempt to obtain a complete copy of the video. During the motion hearing, Detective Stewart explained that when he realized his copy of the surveillance video was incomplete, he did not request another copy be made because he was merely "verifying" the accuracy of the information Crowell provided. Our courts have explained that "[d]ue process does not require the police to conduct a particular type of investigation. Rather, the reliability of the evidence gathered by the police is tested in the crucible of a trial at which the defendant receives due process." <u>State v. Brock</u>, 327 S.W.3d 645, 698 (Tenn. Crim. App. 2009) (internal

- 13 -

quotation marks and citation omitted). Further, "[i]t is not the duty of this Court to pass judgment regarding the investigative techniques used by law enforcement unless they violate specific statutory or constitutional mandates." Brock, 327 S.W.3d at 699 (internal quotation marks and citation omitted). We conclude that the trial court did not err by denying the Appellant's motion to exclude testimony regarding the missing portion of the video.

## B. Hearsay Evidence

The Appellant maintains that the trial court erred by allowing Crowell to testify regarding documents the Appellant's co-workers showed her concerning the Appellant's financial problems, contending that her testimony was inadmissible hearsay. Our supreme court has held specifically that a trial court's factual findings and credibility determinations regarding hearsay are binding upon this court unless the evidence preponderates against them. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015). However, the determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that we review de novo. Id. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. The State concedes that Crowell "did not identify the documents she saw with any certainty" and that "[i]t is therefore unclear whether any exception to the hearsay rule would apply to them." In other words, the State acknowledges that no foundation was laid to establish an exception to the prohibition against hearsay and that the trial court erred by allowing Crowell to testify regarding the documents. However, the State contends the error was harmless. The error at issue is a non-structural constitutional error; accordingly, the test to determine whether the error is harmless is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (internal quotation marks and citations omitted).

Crowell's testimony about the documents she saw was brief, saying only that she saw the Appellant had received advances on a couple of his checks and that the company had "written a check to pay his car note for him." She was unable to recall the amount of the checks. The Appellant contends that the State "repeatedly" utilized the hearsay statements during closing argument as proof of the Appellant's motive for the robbery. However, the Appellant's contention is misleading. Our review of the closing arguments reveals that no mention of motive was made until the Appellant argued that he had no motive to commit the robbery. During the State's rebuttal closing argument, the State noted that it was not required to prove motive but that it had provided a "potential motive in this case, that he's taking out these loans and cash advances." The State also briefly

mentioned the cash advances to suggest the Appellant kept secrets from his wife, such as moving her car and buying a brown velour track suit.

We note that immediately after testifying regarding the hearsay evidence, Crowell testified that before the robbery, the Appellant could not afford to take the family out to eat; however, after the robbery, the Appellant insisted on taking the family to a restaurant and paid for the $80 bill with cash. Therefore, the jury heard other, admissible testimony regarding the Appellant's financial situation. Moreover, the State's references during rebuttal closing argument were brief and in direct response to the Appellant's closing argument. We conclude that Crowell's testimony regarding the documents did not contribute to the verdict; accordingly, we conclude that the admission of the hearsay evidence was harmless. See State v. Devin Banks, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *24 (Tenn. Crim. App. at Jackson, July 6, 2007), aff'd as corrected, 271 S.W.3d 90 (Tenn. 2008).

C.  Photograph Lineup

The Appellant next contends that the trial court committed error by allowing a photograph lineup that showed a jail identificaiton number on the side to be sent to the jury deliberations room even though the court had sustained the Appellant's objection to the lineup. Because a court reporter was unable to hear the proceedings relating to this issue, the parties submitted an agreed statement of evidence cataloging the factual background. See Tenn. R. App. P. 24(c).

The statement of the evidence provides the following:

> That during the direct examination of Detective William Stewart, [the State] placed on the courtroom projector the third page (page C) of the photographic line-up documents. Page C contained the photographs of each of the six people in the line-up along with their corresponding name and OCA number. In Davidson County, an OCA number is a jail identification number. This page was visible on the courtroom monitors. The trial transcript reflects that [the State] asked Detective Stewart a question about this document; as [Detective] Stewart was responding, [defense counsel] asked to approach the bench. . . . [The State] took page C off of the projector before approaching the bench.
>
> At the bench, the following conference occurred: [Defense counsel] made an objection as to the jury viewing Page C. This objection was made pursuant to Tennessee Rule

- 15 -

of Evidence 404(b), that the jurors not learn that [the Appellant] has previously been arrested or incarcerated. [The trial court] sustained the objection. [The trial court] then asked [defense counsel] if they would like for a limiting instruction to be made to the jury. Defense counsel declined for the instruction to be made.

Following the bench conference, the trial court stated: "The third sheet needs to – has not been admitted into evidence. We need to give it to the clerk." . . . The trial transcript does not reflect that Page C was made an exhibit. Redactions to page C were made during a court recess by the trial court clerk. The OCA numbers were marked over with black marker and then covered with white correction tape. Page C was then marked as exhibit 1c and sent back to the jury deliberation room.

In his motion for new trial, the Appellant contended that the trial court "erred in allowing the jurors to view the photograph[] lineup which listed arrest numbers/OCA numbers next to each corresponding photograph." On appeal, the Appellant contends that the trial court committed error when it "sustained the [Appellant's] objection to the State's use of a prejudicial document" but "subsequently allow[ed] the document to be redacted, marked as an exhibit, and sent to the deliberation room with the jury" and that the error was not harmless. The State asserts that the Appellant changed his theories between trial and appeal; therefore, his issue is waived. We agree with the State.

At trial, the Appellant objected to the jury being shown the photograph lineup with OCA numbers accompanying the photographs. The trial court sustained the objection and, according to the statement of the evidence, ordered that the numbers be redacted. The record does not contain any objection by the Appellant regarding the redacted photograph lineup being submitted to the jury during deliberations. It is well-established that a party is bound by the evidentiary theory argued to the trial court and may not change or add theories on appeal. See State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). We will not address issues raised for the first time on appeal. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995). Therefore, the Appellant has waived this issue.

D. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See

- 16 -

State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence.  See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon.  See Tenn. Code Ann. § 39-13-402(a)(1).  Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Tenn. Code Ann. § 39-13-401(a).  A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent.  Tenn. Code Ann. § 39-14-103.

On appeal, the Appellant challenges the validity of the victim's identification of him as the robber.  He contends that inconsistencies between her testimony and other proof at trial calls her credibility into question.  He argues that without her identification, no physical evidence ties him to the crime.

This court has explained a perpetrator's identity "is an essential element of any crime" that the State must prove beyond a reasonable doubt.  State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. at Nashville, Apr. 19, 2005).  A perpetrator's identity "may be established by direct evidence, circumstantial evidence, or a combination of the two."  State v. Juan Diego Vargas, No. M2015-02458-CCA-R3-CD, 2017 WL 678839, at *5 (Tenn. Crim. App. at Nashville, Feb. 21, 2017), perm. to appeal denied, (Tenn. June 7, 2017).  Generally, "[t]he credible testimony of one identification witness is sufficient to support a conviction

- 17 -

if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). "It is well-established that the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

In the light most favorable to the State, the proof adduced at trial reveals that on the morning of October 19, 2013, the Appellant walked into Public Storage and spent a few minutes speaking with O'Donnell about renting a storage unit. The Appellant excused himself to get his wallet from a white Impala parked in front of the store. When he came back inside the store, he pointed a gun at O'Donnell's head and demanded money from the cash register and the safe. After O'Donnell gave him the money, the Appellant left. During an investigation of the crime, the police learned that the Appellant had rented a storage unit from Public Storage recently. Additionally, on the morning of the robbery, the Appellant borrowed his wife's white Impala without telling her. When he returned the car, he parked it in the same spot and left the driver's seat positioned close enough to the steering wheel so that Crowell would not know he had taken the car. When Crowell confronted the Appellant about taking her car, he told her he took it to put gas in it, even though he had been with her the day before when she had put gas in the car. Crowell knew that the family did not have enough money to go out to eat; nevertheless, on the night of the robbery, the Appellant insisted they go out to eat, and he paid the bill, which totaled approximately $80. O'Donnell positively identified the Appellant from a photograph lineup, at a preliminary hearing, and at trial.

"Inconsistency, inaccuracy and omissions in the description of a defendant by a witness who is otherwise able to positively identify the defendant are questions for the jury to consider in determining the weight to be given the testimony." Radley, 29 S.W.3d at 537. The jury heard the proof and clearly resolved the issue of credibility in the State's favor. "[A]lthough inconsistencies or inaccuracies may make the witness a less credible witness, the jury's verdict will not be disturbed unless the inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt." Id. We conclude that any inconsistencies in O'Donnell's testimony were not significant enough to disturb the jury's verdict. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the State adduced sufficient evidence to sustain the Appellant's conviction.

E.  Sentencing

As his final issue, the Appellant contends that the length of the sentence imposed by the trial court was excessive. The State responds that the trial court did not abuse its discretion in sentencing the Appellant. We agree with the State.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence

- 19 -

imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

At the beginning of the sentencing hearing, the State submitted the Appellant's presentence report as an exhibit. The report reflects that the Appellant attended high school through the tenth grade and did not complete the eleventh grade. When the Appellant was seventeen years old, he was convicted of second degree murder and armed robbery and received sentences of thirty-eight years[4] and twelve years. While he was incarcerated, the Appellant obtained his general equivalency diploma (GED), a grounds maintenance certificate, a masonry certificate, a life skills certificate, and a computer information processing certificate. On April 26, 2012, the Appellant was released on parole. The presentence report reflects that the Appellant began working for Express Employment Professionals as a laborer on November 16, 2012, but no ending date is listed. The report also reflects that the Appellant had three pay stubs for October 2013 from Springback Mattress Recycling; the Appellant reported "that he left due to prison." On June 5, 2013, the Appellant was convicted of misdemeanor theft. After reviewing the presentence report, the parties agreed that the Appellant was a Range II, multiple offender.

Detective Stewart testified that he was assigned to investigate the October 11, 2013 aggravated robbery of Kymberly Walker at Public Storage on Welshwood Drive, which resulted in the charge in count one of the indictment.[5] Walker told Detective Stewart that the robbery occurred right after the store opened. Immediately prior to the robbery, a man had called the store to ask if any units were available to rent. Walker thought the call was strange, but she answered that units were available. The robber used a weapon and took property from the store. Walker said that the robber was a black man but that she was not able to identify him because he was wearing a ski mask. Walker saw that the robber was driving a silver Honda Element. Detective Stewart obtained telephone records and discovered that the call that had been placed to the store that morning had come from a telephone registered to Dominique Taylor. Detective Stewart spoke with Taylor and learned that Taylor's stepfather, the Appellant, was in possession of the telephone at the time in question. Additionally, Crowell told Detective Stewart that the Appellant had a silver Honda Element. Detective Stewart said that the police had stopped a vehicle driven by Taylor on October 3, 2013; the police found a ski mask in the vehicle, and Taylor told the police the ski mask belonged to the Appellant. On cross-

---

[4] The presentence report states that the sentence for the second degree murder conviction was either twenty-eight years or thirty-eight years; however, given the provided sentence expiration date, it appears the thirty-eight-year sentence is correct.

[5] This was count one of the indictment.

examination, Detective Stewart said that the person who robbed Walker wore gloves and that the robbery occurred at 10:27 a.m.

After considering the proof, the trial court stated that as a Range II, multiple offender convicted of a Class B felony, the Appellant was subject to a sentence between twelve and twenty years. Tenn. Code Ann. §§ 39-13-402(a)(1); 40-35-112(b)(2). The trial court found that the following enhancement factors applied to the Appellant's sentence: (1) the Appellant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (8) the Appellant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and (13) the Appellant was on parole at the time he committed the offense. Tenn. Code Ann. § 40-35-114(1), (8), (13)(B). The trial court found that no mitigating factors applied. See Tenn. Code Ann. § 40-35-113. The trial court imposed a sentence of eighteen years. The court noted that because the Appellant had a prior conviction of armed robbery, he was required to serve one hundred percent of the sentence in confinement. Tenn. Code Ann. § 40-35-501(k)(2). The court further noted that the eighteen-year sentence must be served consecutively to the previously imposed sentences for second degree murder and armed robbery. Tenn. R. Crim. P. 32(c)(3)(A).

Although the Appellant contends that the length of the sentence imposed by the trial court was excessive, he does not dispute the trial court's application of the enhancement factors; instead, he contends that the trial court did not comply with the purposes and principles of sentencing and that the court erred by failing to apply the "catch-all" mitigating factor, Tennessee Code Annotated section 40-35-113(13), to take into consideration the Appellant's "positive work history and educational achievement." We note that the Appellant did not argue at the sentencing hearing that the trial court should apply any mitigating factors and did not adduce any particular proof in support of the application of any mitigating factors.

This court has held that an offender's sentence may be mitigated "'based upon his family contributions and work ethic.'" State v. Kelley, 34 S.W.3d 471, 482 (Tenn. Crim. App. 2000) (quoting State v. McKnight, 900 S.W.2d 36, 55 (Tenn. Crim. App. 1994)). However, "this court has also held that a stable work history is expected of everyone and, therefore, is not a mitigator." Id. (citing State v. Keel, 882 S.W.2d 410, 423 (Tenn. Crim. App. 1994)). Reconciling these two premises, "this court has affirmed the use of work history in mitigation when the defendant's 'performance has surpassed that which is expected of him.'" Id. at 482-83 (quoting State v. Randal A. Thies, No. 02C01-9708-CC-00299, 1998 WL 391813, at *7 (Tenn. Crim. App. at Jackson, Apr. 24, 1998)). Nevertheless, "while a lack of criminal history and good educational and work history may be entitled to consideration, they are not statutory factors under Tennessee Code Annotated section 40-35-113; it is left to the sound discretion of the trial court whether to

apply the so-called 'catch-all' provision of section 40-35-113(13)." State v. Glenn Lemual Stepp, No. E2013-01291-CCA-R3-CD, 2014 WL 1018215, at *14 (Tenn. Crim. App. at Nashville, Mar. 17, 2014) (internal quotation marks and citations omitted); see State v. Robert Allen Zaloba, No. M2011-00855-CCA-R3-CD, 2012 WL 6690027, at *25 (Tenn. Crim. App. at Nashville, Dec. 26, 2012). We conclude that the trial court did not abuse its discretion by refusing to apply any mitigating factors.

Moreover, the record reveals that the trial court complied with the purposes and principles of sentencing. The proof adduced at the sentencing hearing reveals that after spending over two decades in confinement, the Appellant was released on parole on April 26, 2012; within the next eighteen months, the Appellant committed a misdemeanor theft and the instant aggravated robbery. He also faced a pending charge of robbing the same Public Storage a few days before the instant aggravated robbery. Clearly, the Appellant has failed to rehabilitate and likely will continue to offend. Therefore, the trial court did not abuse its discretion in sentencing the Appellant.

### III. Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 22 -